IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:21-CV-485-FL

| | | |
|---|---|---|
| SIRONDA SANDERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| WAFFLE HOUSE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the court on plaintiff's motion to amend her complaint pursuant to Federal Rule of Civil Procedure 15(a), (DE 27), and defendant's motion for summary judgment, (DE 20), pursuant to Federal Rule of Civil Procedure 56. Both motions have been briefed fully, and the issues raised are ripe for ruling. For the reasons that follow, plaintiff's motion is denied, and defendant's motion is granted.

### STATEMENT OF THE CASE

Plaintiff commenced this action against her former employer October 17, 2021, in the Superior Court of Wake County, North Carolina in a case captioned Sironda Sanders v. Waffle House, Inc., Case No. 21-CVS-14591. Plaintiff alleges defendant withheld overtime wages and tips in violation of the wage payment provision of the North Carolina Wage and Hour Act ("NCWHA"), N.C. Gen Stat. § 95-25.6; retaliated against her for making complaints of lost wages in violation of the North Carolina Retaliatory Employment Discrimination Act ("REDA"), N.C. Gen. Stat. § 95–241 et seq.; and discharged her in violation of the public policy of North Carolina, as expressed in N.C. Gen. Stat. § 143-422.2(a).

Defendant removed to this court November 23, 2021, and, after a period of discovery, moved for summary judgment August 19, 2022. In support, defendant relies upon plaintiff's personnel file; discovery responses and requests; plaintiff's deposition and exhibits thereto; records of calls plaintiff made to defendant's associate hotline; and the declaration of Diego Huerta ("Huerta"), defendant's former district manager and present division manager.

Plaintiff responded in opposition September 23, 2022, with reliance upon affidavits by plaintiff; Khadijah Scarborough ("Scarborough"), plaintiff's former co-worker; and Rodney Watson ("Watson"), whom plaintiff formerly served at defendant restaurant.

On that same date, plaintiff moved to amend her complaint to add new claims. Defendant responded in opposition.

## STATEMENT OF FACTS

The undisputed facts may be summarized as follows.[1] Plaintiff was hired by defendant Waffle House as a "tipped salesperson" November 5, 2018. (Def. Stmt. (DE 21) ¶¶ 1-2). Defendant uses an electronic timekeeping system to track and record employee hours and payrates, automatically calculating overtime pay when an employee exceeds forty hours in a week. (Id. ¶¶ 4-6).

---

[1] Local rule requires that the memorandum opposing a motion for summary judgment "be supported by a separate statement including a response to each numbered paragraph in the moving party's statement, in correspondingly numbered paragraphs." Loc. Civ. Rule 56.1(a)(2). Plaintiff here did not comply with that rule, instead filing her own separate statement of facts lacking any indicia of a relation to defendant's. As plaintiff does not "specifically controvert[]" any of defendant's paragraphs with "a correspondingly numbered paragraph," by local rule defendant's statement of facts are deemed admitted for the purpose of the instant motion. See Felton v. Moneysworth Linen Serv., Inc., 295 F. Supp. 3d 595, 597 n.1 (E.D.N.C. 2018) ("Felton did not specifically controvert defendants' statement of undisputed material facts. Thus, the court relies on defendants' statement of undisputed material facts and cites to the statement."); Howard v. Coll. of the Albemarle, 262 F. Supp. 3d 322, 329 n.1 (E.D.N.C. 2017), aff'd, 697 F. App'x 257 (4th Cir. 2017). Where, however, plaintiff's statement demonstrates disagreement with a particular fact asserted by defendant, the court takes into account evidence cited by both plaintiff and defendant in its analysis.

Plaintiff had a strained relationship with her manager, Katrina White ("White"). (Id. ¶ 7). Both White and plaintiff are black females. (Id. ¶¶ 8-9). Throughout her tenure plaintiff received several documented warnings including for improper uniform; leaving her shift early, in one instance explaining she had to do so "before she went to jail for hurting someone"; and informing customers that White had interfered with the preparation of their food, causing them to leave. (Id. ¶¶ 10-11). Concurrently, plaintiff called defendant's associate hotline, reporting alleged misconduct by White including that she yelled at plaintiff, had issued documentation of warning in retaliation for plaintiff's hotline calls, and was otherwise treating her "unfairly." (Id. ¶¶ 12-15).

Plaintiff was transferred to another location in late December 2019 or early January 2020, moving from "Unit 1302 in Apex, North Carolina to Unit 1090 in Morrisville, North Carolina." (Id. ¶¶ 17-18). The last date plaintiff completed a shift at the Morrisville location was January 13, 2020, and thereafter plaintiff stopped "showing up for her shifts." (Id. ¶¶ 19, 21). Defendant terminated plaintiff's employment January 21, 2020, citing "violation of the Attendance Control Policy and failure to report to work/quit without notice as the reasons for termination," in addition to plaintiff having a "poor attitude" and being "very argumentative." (Id. ¶ 21).

## COURT'S DISCUSSION

A. Plaintiff's Motion to Amend

1. Standard of Review

"[A]fter the deadlines provided by a scheduling order have passed, the good cause standard [of Federal Rule of Civil Procedure 16] must be satisfied to justify leave to amend the pleadings." Nourison Rug Corp. v. Parvizian, 535 F.3d 295, 298 (4th Cir. 2008).[2] Under Rule 16, a scheduling order "may be modified only for good cause." Fed. R. Civ. P. 16(b)(4). In the event the Rule 16

---

[2] Throughout this order, internal citations and quotation marks are omitted from citations unless otherwise specified.

good cause standard has been met, the court must consider whether the motion to amend should be granted under Rule 15. Cook v. Howard, 484 F. App'x 805, 814 (4th Cir. 2012). Rule 15 guides that "[t]he court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2).

2. Analysis

Defendant argues in opposition to plaintiff's motion to amend that plaintiff has failed to establish good cause. The court agrees.

Although the United States Court of Appeals for the Fourth Circuit has not addressed in published opinion all the factors guiding the good cause analysis in this context, it has recognized in unpublished opinions that "Rule 16(b)'s good cause standard focuses on the timeliness of the amendment and the reasons for its tardy submission; the primary consideration is the diligence of the moving party." See, e.g., Montgomery v. Anne Arundel County, 182 F. App'x 156, 162 (4th Cir. 2006).

"Good cause requires the party seeking relief [to] show that the deadlines cannot reasonably be met despite the party's diligence, and . . . the good-cause standard will not be satisfied if the [district] court concludes that the party seeking relief (or that party's attorney) has not acted diligently in compliance with the schedule." Cook, 484 F. App'x at 815 (alterations in original). The burden is on the "movant . . . [to] demonstrate that the reasons for the tardiness of [her] motion justify a departure from the rules set by the court in its scheduling order." United States v. Godwin, 247 F.R.D. 503, 506 (E.D.N.C. 2007); see also Montgomery, 182 F. App'x at 162 (inquiring into whether the moving party had a "good reason for [its] tardy submission of the motion to amend").

4

"If the moving party knew of the underlying conduct giving rise to a claim" to be added by untimely amendment "but simply failed to raise it in an initial complaint, then the party cannot establish good cause under Rule 16." Faulconer v. Centra Health, Inc., 808 F. App'x 148, 152 (4th Cir. 2020). However, if even "some of the evidence needed by [the movant] to prove its new . . . claim did not surface until after the amendment deadline," this alone may justify good cause under Rule 16. In re Lone Star Indus., Inc. Concrete R.R. Cross Ties Litig., No. 93-1505, 1994 WL 118475, at *11 (4th Cir. Apr. 7, 1994) (emphasis in original).

The court ordered deadline for plaintiff to amend pleadings was June 3, 2022, and plaintiff filed the instant motion September 23, 2022. Plaintiff's motion is thus untimely. In support of allowing the motion, plaintiff contends that "new information was found regarding additional claims experienced by the Plaintiff as a result of the Defendant." (M. to Amend (DE 27) at 1). Plaintiff did not file a memorandum accompanying her motion and does not otherwise provide support for her contention.[3]

On review of her proposed amended complaint, plaintiff seeks to add new claims for relief for assault, battery, respondeat superior liability, and breach of contract, based upon facts within the operative complaint. Plaintiff's claims for battery and assault cite her manager "shoulder check[ing]" her, a fact specifically pleaded in the original complaint. (Compl. (DE 1-1) ¶ 38). Plaintiff's claims for respondeat superior liability assert only that defendant is liable for the conduct of plaintiff's manager, White, which conduct also was described in the original complaint. Finally, plaintiff's claim for breach of contract is based upon defendant reducing plaintiff's hours

---

[3] Plaintiff's failure to file an accompanying supporting memorandum is again in violation of the local rules. See Loc. Civ. Rule 7.1(e) ("Except for motions which the clerk may grant as specified in Local Civil Rule 77.2, all motions made, other than in a hearing or trial, shall be filed with an accompanying supporting memorandum in the manner prescribed by Local Civil Rule 7.2(a).").

5

and failing to provide documentation so that she could maintain childcare, all as alleged in her originally filed complaint. (Id. ¶¶ 44-50). Thus, contrary to plaintiff's contention, the claims plaintiff seeks to add are not based upon newly discovered information. Rather, they rely upon facts plaintiff already pleaded, and also upon actions by defendant plaintiff personally experienced prior even to commencing this is suit. See Faulconer, 808 F. App'x at 152.

Plaintiff has failed to demonstrate good reason for her tardy submission, and her motion to amend her complaint is denied.

A. Defendant's Motion for Summary Judgment

1. Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Once the moving party has met its burden, the non-moving party then must "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). Only disputes between the parties over facts that might affect the outcome of the case properly preclude entry of summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (holding that a factual dispute is "material" only if it might affect the outcome of the suit and "genuine" only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party).

6

Case 5:21-cv-00485-FL   Document 32   Filed 03/21/23   Page 6 of 16

"[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's] favor." Id. at 255; see United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion.").

Nevertheless, "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the [factfinder] when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 241 (4th Cir. 1982). Thus, judgment as a matter of law is warranted where "the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture." Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005). By contrast, when "the evidence as a whole is susceptible of more than one reasonable inference, a [triable] issue is created," and judgment as a matter of law should be denied. Id. at 489-90.

2. Analysis

Plaintiff asserts claims under the NCWHA and REDA, as well as a claim for wrongful termination. The court considers each claim in turn.

a. NCWHA

Pursuant to the wage payment provision of the NCWHA covered employers are required to "pay every employee all wages and tips accruing to the employee on the regular payday." N.C.

Gen. Stat. § 95-25.6. The NCWHA also mandates that employers "pay each employee who works longer than 40 hours in any workweek at a rate of not less than time and one half of the regular rate of pay of the employee for those hours in excess of 40 per week." N.C. Gen. Stat. § 95-25.4.

Plaintiff here contends her manager, White, removed hours plaintiff worked from defendant's electronic timekeeping system, resulting in lost wages, including lost overtime wages. She also contends White withheld her food tickets, resulting excessive wait times and reduced tips.

In support of her claim for lost wages, plaintiff relies upon her own testimony, citing to the following:

> Q. Okay. So, when you got your weekly pay, did it show how many hours were on there?
> A. Yes, some of them.
> Q. But it shows you, it shows you the math, this is how much you get paid per hour and this is how many hours, right?
> A. Yes.
> Q. And so when you got that, if you thought it was wrong what did you do about it?
> A. I say something to [Huerta] or I say something to [White].
> Q. All right. Did you ever, well, let me back up to that. So, you would say something to [Huerta]. How would you go about getting in touch with him?
> A. I could text him, call his phone, but mostly every day he will come through because he was the GM.
> Q. How many times do you think you told [Huerta] that there was some problem with your pay?
> A. I think I said something to him twice.

(Pl. Dep. (DE 22-3) 47:17-25, 48:3-10).

Plaintiff thereafter recounted those two instances, providing that in the first instance, after plaintiff notified Huerta of the discrepancy, either Huerta or White "put extra on [plaintiff's] check that week." (Id. 48:14-15). When asked if that addition fully accounted for the number of hours she worked, plaintiff responded she "didn't even really pay attention" and was not sure. (Id. 48:16-19).

With respect to the second instance, plaintiff testified White had "clocked [her] out" while plaintiff still was working, resulting in four hours of lost wages. (Id. 49:4-16). Plaintiff could not recall the date or time of the incident, and though she did not believe the issue was resolved, she was not certain:

> Q. So, you should have gotten an extra four hours that week?
> A. Yes.
> Q. That day.
> A. That day.
> Q. Did that get fixed?
> A. I don't think so.
> Q. You don't know when that happened?
> A. Not right now. Not off hand, no.

(Id. 49:17-18, 50:12-20). Plaintiff confirmed that there were no other instances in which she "complained to [defendant] about [her] hours being wrong on [her] paycheck." (Id. 53:1-5).

Plaintiff's testimony does not create a genuine issue of fact that she was denied wages. In the first instance, plaintiff testified that after alerting Huerta to the issue he investigated and added the outstanding wages in the pay period following. Thus, by plaintiff's account, assuming plaintiff was in this instance denied wages, once Huerta was made aware, he acted promptly to reimburse plaintiff. Cf. Bailey v. Cnty. of Georgetown, 94 F.3d 152, 157 (4th Cir. 1996) (requiring actual or constructive knowledge of the wages withheld before liability attaches under the FLSA).[4] In the second instance, plaintiff testified that though she believed wages remained outstanding, she could not say so with any certainty. See Pforr v. Food Lion, Inc., 851 F.2d 106, 108 (4th Cir. 1988)

---

4    Although neither the United States Court of Appeals for the Fourth Circuit nor the North Carolina Supreme Court have directly addressed the issue in published opinions, courts generally look to case law applying the Fair Labor Standards Act ("FLSA") to interpret the NCWHA. See Armento v. Asheville Buncombe Cmty. Christian Ministry, Inc., 856 F. App'x 445, 451 (4th Cir. 2021) ("Because the NCWHA defines the relevant terms identically to the [FLSA], we may look to federal interpretations of the FLSA for guidance."); Garcia v. Frog Island Seafood, Inc., 644 F.Supp.2d 696, 707 (E.D.N.C. 2009) (applying federal decisions interpreting the term "employee" to NCWHA claims); Powell v. P2Enterprises, LLC, 247 N.C. App. 731, 733–34, 786 S.E.2d 798, 800 (2016) (same).

("[P]laintiff under the FLSA need [] show the amount and extent of improperly compensated work as a matter of just and reasonable inference").

Indeed, plaintiff could not speak with certainty even as to the date of the second incident, or to her hours generally. (See Pl. Dep. (DE 22-3) 53:22-25, 54:1-3 (testifying that she did not "keep up" with her hours in any way). To find a genuine issue of material fact under the NCWHA on plaintiff's testimony alone thus "would necessarily be based on speculation and conjecture." Myrick, 395 F.3d at 489.

Turning to plaintiff's claim made with respect to lost tips, plaintiff alleges White placed plaintiff's orders at the bottom of the order pile, which resulted in longer waiting times for her customers, who in turn tipped plaintiff smaller amounts. Assuming White did engage in this conduct, plaintiff's claim is entirely speculative, based upon conjecture about tips plaintiff would have received had her customers' food arrived in a timelier fashion. Theoretical tips cannot be said to have "accru[ed]" under the NCWHA. N.C. Gen. Stat. § 95-25.6.

Where no genuine issues exist for trial, the court grants defendant's motion with respect to plaintiff's claims under the NCWHA.

      b.     REDA

Plaintiff alleges defendant retaliated against her after she made complaints about unearned tips and wages, in violation of REDA.

REDA prohibits discrimination or retaliation against an employee who engages in listed activity in relation to one of several enumerated provisions of the North Carolina General Statutes, including the NCWHA. N.C. Gen. Stat. § 95–241(a)(1). To support a claim under REDA, a plaintiff must show that (1) she exercised her right to engage in a protected activity; (2) she suffered an adverse employment action; and (3) a causal connection exists between the exercise of

the protected activity and the alleged retaliatory action. See id.; accord Smith v. Computer Task Grp., Inc., 568 F. Supp. 2d 603, 613 (M.D.N.C. 2008); Wiley v. United Parcel Serv., Inc., 164 N.C. App. 183, 186 (2004); cf. Abels v. Renfro Corp., 335 N.C. 209, 216 (1993) (evaluating a claim under N.C.G.S. § 97–6.1, which statute REDA replaced).

Plaintiff's proffered evidence is deficient in two respects: she has not established that she engaged in a protected activity under REDA and, alternatively, assuming she did engage in protected activity, plaintiff has not demonstrated a causal connection between that activity and defendant's alleged retaliatory actions.

By its terms, REDA covers a wide array of activity done in relation to the NCWHA and other covered statutes, ranging from the filing of a formal complaint to initiating inquiry. See N.C. Gen. Stat. § 95–241(a) (no person shall take any retaliatory action against an employee because the employee "file[s] a claim or complaint, initiate[s] any inquiry, investigation, inspection, proceeding or other action, or testif[ies] or provide[s] information to any person with respect to" the NCWHA, among other listed statutes) (emphasis added); accord Smith, 568 F. Supp. 2d at 615. However, courts have consistently held that making oral complaints to a supervisor, even regarding a subject covered by REDA, is not a protected activity. See, e.g., Delon v. McLaurin Parking Co., 367 F. Supp. 2d 893, 902 (M.D.N.C. 2005) ("The complaint that Plaintiff made to [a manager] [i]s not . . . protected under REDA. Rather, it was merely a complaint to a manager about a supervisor."); Whiting v. Wolfson Casing Corp., 173 N.C. App. 218, 222 (2005) (holding the plaintiff's act of requesting that her employer pay for a medical evaluation of a work-related injury was not a protected activity under the North Carolina Workers' Compensation Act).

Plaintiff here testified that there were only two instances in which she "complained to [defendant] about [her] hours being wrong on [her] paycheck." (Pl. Dep. (DE 22-3) 53:1-5). Both

were oral complaints to a supervisor, first to Huerta and second to White. Such does not rise to the level of protected activity under REDA.

In addition, and in the alternative, assuming plaintiff's complaints to Huerta and White were protected activity, plaintiff also has not established a causal connection between these complaints and any alleged adverse action by defendant.

Rather, plaintiff in opposition relies upon calls she made to defendant's associate hotline to establish causation. She argues in her memorandum she made mention in those calls of withheld tips. On review of the record of those calls, however, though plaintiff reported interpersonal issues between her and White, including that White "purposely refused to call her orders," she does not mention tips or otherwise indicate that she was not accurately compensated. (See generally Hotline Case Details (DE 22-4)). That defendant may have inferred some impact on plaintiff's tips from her complaints of customers enduring longer wait times does not transform plaintiff's comments, the thrust of which concerned allegations of harassment by White, into an exercise of plaintiff's rights under the NCWHA.[5]

The court accordingly grants defendant's motion with respect to plaintiff's claim under REDA.

    c.    Wrongful Termination

Plaintiff alleges she was wrongfully terminated because of her race and gender, in violation of North Carolina public policy.[6]

---

[5] Notably, defendant's statement of facts, deemed admitted by local rule, states: "While Plaintiff frequently called the Associate Hotline to report interpersonal issues involving Ms. White, she never made any claim of discrimination, nor did Plaintiff state that she believed that she was not accurately compensated for the hours she worked. (Def. Stmt. (DE 21) ¶ 16); see Loc. Civ. Rule 56.1(a)(2).

[6] Plaintiff also asserts she was terminated in violation of public policy, as expressed by the NCWHA. The court already has determined that plaintiff failed to establish a claim under the NCWHA, and so does not reach whether plaintiff may additionally claim wrongful termination in violation of public policy on this basis.

12

Section 143-422.2, "known as North Carolina's Equal Employment Practices Act (NCEEPA)," states, in relevant part, that "[i]t is the public policy of this State to protect and safeguard the right and opportunity of all persons to seek, obtain and hold employment without discrimination or abridgement on account of race, religion, color, national origin, age, sex or handicap." Townsend v. Shook, 323 F. App'x 245, 251 (4th Cir. 2009) (quoting N.C. Gen. Stat. § 143-422.2(a)).  While "[n]either the North Carolina Supreme Court nor the North Carolina Court of Appeals has recognized a private cause of action under the NCEEPA," Smith v. First Union Nat. Bank, 202 F.3d 234, 247 (4th Cir. 2000), the United States Court of Appeals for the Fourth Circuit has held that N.C. Gen. Stat. § 143-422.2 "does apply to common law wrongful discharge claims or in connection with other specific statutory remedies." McLean v. Patten Cmtys., Inc., 332 F.3d 714, 720 (4th Cir. 2003); see also Townsend, 323 F. App'x at 251 (explaining that in McLean the Fourth Circuit "held that a plaintiff does have a private cause of action under North Carolina common law for violation of public policy, specifically [section 143-422.2]").

Accordingly, under North Carolina law, "while there may be a right to terminate a contract at will for no reason, or for an arbitrary or irrational reason, there can be no right to terminate such a contract for an unlawful reason or purpose that contravenes public policy," Coman v. Thomas Mfg. Co., 325 N.C. 172, 175 (1989), with one such public policy being that expressed in the NCEEPA. See generally Amos v. Oakdale Knitting Co., 331 N.C. 348, 353 (1992) ("At the very least public policy is violated when an employee is fired in contravention of express policy declarations contained in the North Carolina General Statutes.")

To establish wrongful discharge on account of her race and gender, pursuant to and violative of the public policy enumerated in N.C. Gen. Stat. § 143-422.2, plaintiff must either proffer "direct evidence of discrimination" on account of her race and gender or "establish a prima

13

facie case of discrimination." Hardin v. Belmont Textile Mach. Co., 355 F. App'x 717, 721 (4th Cir. 2009) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973)). To establish a prima facie case, plaintiff need demonstrate that:

> (1) that [s]he is a member of a protected class; (2) that [s]he suffered from an adverse employment action; (3) that at the time the employer took the adverse employment action [s]he was performing at a level that met h[er] employer's legitimate expectations; and (4) that the position was filled by a similarly qualified applicant outside the protected class.

Id.; accord Hughes v. Bedsole, 48 F.3d 1376, 1383 (4th Cir. 1995) (utilizing the same four prima facie elements for a claim of "wrongfully discharge[] . . . on the basis of [plaintiff's] sex in violation of the public policy enunciated in the North Carolina Equal Employment Practices Act").

Plaintiff does not make argument in her opposition bearing on a prima facie case, and in the court's review she has not offered evidence with respect to her performance meeting legitimate expectations or her position being filled by someone of another race or gender. Turning, then, to plaintiff's alternative avenue of proof, for a plaintiff to survive summary judgment using direct evidence of discrimination she "must produce direct evidence of a stated purpose to discriminate and/or indirect evidence of sufficient probative force to reflect a genuine issue of material fact." Brinkley v. Harbour Recreation Club, 180 F.3d 598, 607 (4th Cir. 1999), overruled on other grounds by Desert Palace v. Costa, 539 U.S. 90 (2003). Such evidence includes "conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." Id. "Derogatory remarks may in some instances constitute direct evidence of discrimination." Id. at 608. However, "in the absence of a clear nexus with the employment decision in question, the materiality of stray or isolated remarks is substantially reduced." Merritt v. Old Dominion Freight Line, Inc., 601 F.3d 289, 300 (4th Cir. 2010); see Brinkley, 180 F.3d at 608 ("[U]nless the remarks upon which plaintiff relies were related to the employment decision in question, they cannot be evidence of discrimination.").

14

Plaintiff testifies that White, her manager, told her to wear a hairnet when no one else was required to do so; made abusive comments about plaintiff's gender, including that she needed a sex change; and accused plaintiff of stealing. Assuming these comments constitute direct evidence of discrimination, plaintiff does not explain a nexus between them and her eventual termination. She does not, for instance, provide that the comments were made in close temporal proximity to it.

Further, to the extent a causal connection could otherwise be inferred, it is severed by the undisputed fact that in the week prior to her termination plaintiff did not show up for her shifts at her newly assigned restaurant, where White, the alleged bad actor, did not work.[7] See Feldman v. Law Enforcement Assocs. Corp., 752 F.3d 339, 349 (4th Cir. 2014) (finding a plaintiff's admission that "[o]utside Directors considered him to have thrown them under the bus" constitutes a "legitimate intervening event," which "coupled with the passage of a significant amount of time after the employee's alleged protected activities, severs the causal connection" between his protected activity and his termination). Plaintiff's termination report indeed cites her failure to report to work as the reason for defendant ceasing her employment.

Plaintiff's claim for wrongful termination fails as a matter of law.

---

[7] Plaintiff argues her transfer to the new location without similar shift availability amounted to a constructive termination. Plaintiff does not cite to case law in support of this contention, and the court in its review has found none.

15

Case 5:21-cv-00485-FL   Document 32   Filed 03/21/23   Page 15 of 16

## CONCLUSION

Based on the foregoing, plaintiff's motion to amend her complaint, (DE 27), is DENIED and defendant's motion for summary judgment (DE 20) is GRANTED. The clerk is DIRECTED to close this case.

SO ORDERED, this the 21st day of March, 2023.

_____
LOUISE W. FLANAGAN
United States District Judge